1

2

3

4

5

6

7   # UNITED STATES DISTRICT COURT

8   ## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK GALLEGOS, | ) | 1:06-cv-00078 GSA |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | (Document 16) |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

18   ## **BACKGROUND**

19      Plaintiff Mark Gallegos ("Plaintiff") seeks judicial review of a final decision of the

20   Commissioner of Social Security ("Commissioner") denying his application for supplemental

21   security income ("SSI") pursuant to Title XVI of the Social Security Act.  The matter is currently

22   before the Court on the parties' briefs, which were submitted, without oral argument, to the

23   Honorable Gary S. Austin, United States Magistrate Judge.[1]

24

25

26

27   _____

28      [1]The parties consented to the jurisdiction of the United States Magistrate Judge.  On June 5, 2006, the
Honorable Oliver W. Wanger reassigned the case to the Honorable Sandra M. Snyder for all purposes.  On February
5, 2008, the case was reassigned to the undersigned for all purposes.

## FACTS AND PRIOR PROCEEDINGS[2]

On May 7, 1999, Plaintiff filed an application for SSI benefits.  AR 77-79.  He alleged disability since November 17, 1978, due to brain injuries.  AR 77-79, 91.  After being denied both initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 58-61, 65-68, 69.  On January 31, 2002, ALJ Richard A. Urbin held a hearing.  AR 29-50.  ALJ Urbin denied benefits on February 25, 2002.  AR 11-23.  On April 15, 2002, the Appeals Council denied Plaintiff's request for review.  AR 8-9.

In December 2002, the parties stipulated to a remand by the district court for further administrative proceedings, including a new hearing and decision.  AR 399-401.  Based on the parties stipulation, the court remanded the case for further proceedings.  AR 397-398.  On June 7, 2003, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings consistent with the order of the court.  AR 395-396.

On May 18, 2005, Patricia Flierl held a hearing.  AR 517-552.  ALJ Flierl denied benefits on September 21, 2005.  AR 357-367.

On January 19, 2006, Plaintiff filed the instant action for court review.

Hearing Testimony

On May 18, 2005, ALJ Flierl held a telephonic hearing in Fresno, California.  AR 517-552.  Plaintiff appeared by telephone from an area conservation center.  AR 520.  Plaintiff's attorney, Lawrence Rohlfing, appeared by telephone from his office.  AR 520.  Vocational expert ("VE") Tom Dachelet also appeared and testified.  AR 519, 548-551.  At the outset of the hearing, the ALJ indicated that it had been two years since the last hearing and the present hearing should include Plaintiff's physical and mental limitations.  AR 520.

In response to questions from the ALJ, Plaintiff testified that he has not worked since the last hearing.  AR 521.  The last time he worked was in 1997 or in 1998.  AR 521.  He was released from prison in November 1994.  AR 521.  He was re-incarcerated on June 24, 2003, for a new charge.  AR 521.  He was caught with a gun and trafficking marijuana.  AR 522.  He is

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

"getting out" in March 2008.  AR 522.  Plaintiff also testified that he has been exposed to TB and is taking medication for it.  AR 522.

In response to questions from his attorney, Plaintiff testified that he had been trafficking marijuana for a couple years before he was incarcerated.  AR 522.  He was making enough money to pay his rent and to feed himself.  AR 522.  He probably made about $700-800 per month for two or three years.  AR 523.  When he appeared at the prior hearing he was selling marijuana.  AR 523.  Between 2002 and the day he was incarcerated, he did not go to school or try to attend any vocational training.  AR 523.  While he was "out," he received treatment at Pacific Clinic, a mental health facility.  AR 523.  He would talk to the psychiatrist.  AR 523.  He was on Zyprexa, which helped.  AR 524.  The Zyprexa was treating his symptoms of hearing voices and schizophrenia.  AR 524.  While on Zyprexa, he did not hear voices.  AR 524.  They were "completely under control."  AR 524.

Plaintiff testified that during the period between April 28, 1999, and June 2003, his ability to get along with other people was good.  AR 524.  He was taking Zyprexa.  AR 525.  He stayed away from people, but when he had to deal with them, he dealt with them "pretty good."  AR 525.  He got into some physical fights with other men about once every five or six months.  AR 525-526.  He got into physical fights with women about once every couple of years.  AR 526.  He did not get into fights with people that he came in contact with on the street, but with peopled from past relationships.  AR 526.  Between 1999 and 2003, he got into verbal yelling matches with other people a couple times a month.  AR 526.

Plaintiff testified that he was a bully.  AR 527.  If someone stood up to him, he would end up either fighting or having a yelling match.  AR 527.  That has been the pattern throughout much of his adult life and even when he was a teenager.  AR 527.  Plaintiff testified that how he got along with people is not what "you call normal or what would be normal."  AR 527.

Between 1999 and 2003, while taking his medication, Plaintiff had problems being suspicious.  AR 528.  Sometimes he used drugs or alcohol in addition to taking the medication.  AR 528.  He would drink once or twice a week at night.  AR 528.  He would consume about a 40

1    ounce malt liquor.  AR 528.  He did not get into fights or altercations when he was drinking.  AR

2    529.  He drank at home by himself most of the time.  AR 529.

3        Plaintiff testified that he had a head injury after a motorcycle accident in 1978.  AR 529.

4    After the head injury, he was a little slower to react.  AR 529.  People would have to repeat

5    things and he was kind of slow.  AR 529.  It caused him to want to medicate himself, "do alcohol

6    and drugs," be suspicious and not be trusting.  AR 530.  He did not have feelings of people

7    talking about him or not trusting people when he was taking his medication.  AR 530.  The

8    symptoms got better with medication.  AR 530.  He found himself more trusting, easygoing, and

9    a lot calmer.  AR 530.  By a lot calmer, he was talking about where he is getting into physical

10   fights twice a year or so, yelling matches a couple times a month and still bullying people.  AR

11   530.  His demeanor was a lot more relaxed.  AR 530.

12       Plaintiff testified that he is not receiving any kind of psychiatric care while incarcerated.

13   AR 530.  His psychotic symptoms have returned.  AR 530.  He has been dealing with it and

14   keeping it to himself.  AR 530.  He isolates himself and does his own program.  AR 530.

15       Plaintiff testified that he suffers from hepatitis C.  AR 531.  He feels "real tired," fatigued

16   most of the day, but tries to be active.  AR 531-532.  He sleeps when he has the opportunity.  AR

17   532.  It "helps a lot."  AR 532.  When he is feeling fatigued, he cannot walk at all.  AR 532.

18   When he is feeling fatigued, he can walk from his cell to the mess hall.  AR 532.  It is about a

19   "couple blocks."  AR 532.  When he gets to the mess hall, he is able to stand in line and get his

20   food.  AR 532.  When he is feeling fatigued, he is able to get back to the table and sit down to

21   eat.  AR 533.  If he wanted, he could walk to the mess hall and back without stopping.  AR 533.

22   He did not know if he could walk to the mess hall and back twice without stopping when he is

23   feeling fatigued.  AR 533.  He could walk four blocks.  AR 533.  When he is feeling fatigued, he

24   generally can stand not more than 10 minutes before he must sit down.  AR 533.  He has

25   difficulty sitting in one place.  AR 533. He can sit for five minutes and then will get up and

26   stretch.  AR 534.  He can sit for at least 15 or 20 minutes.  AR 534.  He could endure sitting

27   about 20 minutes when he is feeling fatigued.  AR 534.

28

1    Plaintiff testified that he can lift and carry about 50 pounds for an hour.  AR 534-535.  He
2    could lift 25 pounds more frequently than 50 pounds.  AR 535.  He did not think he could remain
3    productive for an eight-hour day.  AR 536.  He thought he could string together an hour and a
4    half.  AR 536.  When he was selling marijuana, he worked a couple hours a day.  AR 536.  He
5    would do that whenever he had an opportunity.  AR 536.

6    Plaintiff testified that between 1999 and 2003, he could not have handled a very easy,
7    sedentary job, which required sitting down most of the day and never lifting more than 10
8    pounds, because of his fatigue.  AR 536-537.  During that same period, he could maintain
9    attention and concentration about 50 percent of the time.  AR 537.

10   Plaintiff testified that he is not taking any medication for his Hepatitis C and he was not
11   taking any before 2003.  AR 537.  He has not received "interferon" or any other kind of
12   chemotherapy treatment.  AR 537.

13   Plaintiff testified that he was living alone between 1999 and 2003.  AR 538.  He rented a
14   room.  AR 538.  He had to keep his own room clean.  AR 538.  He kept it neat.  AR 538.  He had
15   a bed in the room.  AR 538.  He did not wash his own sheets.  AR 538.  His sister used to do
16   laundry.  AR 538.  He sometimes did his own grocery shopping.  AR 538.  He would go grocery
17   shopping once every couple months, but his sister usually would help him.  AR 538.  She would
18   take him to the store.  AR 538.

19   Plaintiff testified that he was unrelated to the people renting him a room.  AR 539.  He
20   sometimes got along with the people renting rooms.  AR 539.  Between 1999 and 2003, he lived
21   in about five different places.  AR 540.  He moved because they would raise the rent or he would
22   not get along with the people there.  AR 540.

23   In response to questions from the ALJ, Plaintiff testified that he found out he had
24   Hepatitis C in 2000.  AR 540.  Between 2000 and 2003, he did not have any medical insurance.
25   AR 540.  He tried to get MediCal, but they "wouldn't give it to [him]."  AR 540.  He currently
26   takes TB medication.  AR 541.  He is not taking any other medications and they are not giving
27   him anything for mental and emotional problems.  AR 541.  He does not see a psychiatrist.  AR
28   541.  He could see one if he wanted.  AR 541.  He is "kind of doing all right" and trying "to do

[his] time and get out." AR 541. He does not want to see a psychiatrist who could put him back
on Zyprexa. AR 541. He could see him, but with the hepatitis C, the mediation "messes with"
his liver. AR 541. The doctor told him that. AR 541. He quit taking it just before he left the
street because it was "messing" with his liver. AR 541. He has not tried other medications. AR
542.

 Plaintiff testified that he has a job while in prison. AR 542. He works on the kitchen line
five days a week. AR 542-543. He worked a split shift from 6:00 to 7:30 in the morning and
then from 5:00 to 7:30 in the evening. AR 543. He works about four hours a day. AR 543. He
passes trays while standing. AR 543-544. The standing causes a "little bit" of a problem. AR
544. After he finishes his morning shift, he goes back to his cell to sleep. He goes back to work
about 4:30. AR 544. When he is finished at 7:30, he takes a shower, goes to get his TB
medication and returns to his cell. AR 544. When he returns to his cell, he reads a book, listens
to the radio, gets his rest, kicks back and relaxes. AR 545. He walks laps in the yard three times
a week. AR 545. He walks about six laps. AR 545. Three laps are a mile. AR 545. He goes to
sleep after the lights go out at about 11:00. AR 545.

 Plaintiff testified that he is right-handed. AR 545. His ring finger does not "fully
extend." AR 545-546. It gets in the way sometimes. AR 546. It turns toward the palm of his
hand a little bit. AR 546. Gripping is okay because it closes. AR 546. It "doesn't open." AR
546. He uses his right hand for writing. AR 546. It is not a problem. AR 546. He can write.
AR 546.

 Plaintiff testified that he has something wrong with one leg, when he sustained a head
injury in 1978. AR 546. He was in a coma. AR 547. One leg is shorter and he walks with a
limp. AR 547. It hurts when "it gets real cold and stuff." AR 547. It acts "funny," like
paralysis. AR 547. He has to walk on it a little. AR 547. It goes to sleep when it is cold or
walks on it. AR 547. He has never taken pain pills for it. AR 547. He tries to limit any type of
medication because of his hepatitis. AR 547.

 Plaintiff testified that he goes to the mess hall to eat twice a day. AR 547. They give him
a bag lunch. AR 548. After he finishes his duty in the evening, his leg feels tired. AR 548. He

1  has "to go and get some rest, get off of it." AR 548.  He experiences pain in his knee and his

2  ankle.  AR 548.  He does not have any back pain.  AR 548.

3      VE Thomas Dachelet also testified.  AR 548.  The VE reviewed the work history report.

4  AR 549.  There were three jobs that are light physical demand, unskilled.  AR 549.

5      Plaintiff again testified in response to questions from the ALJ.  Plaintiff was born on May

6  5, 1960, and was 45 years old at the time of the hearing.  AR 550.  He completed the tenth grade.

7  AR 550.

8      The ALJ asked the VE to assume a hypothetical individual between he ages of 38-39 to

9  age 45 with a residual functional capacity for light work with no repetitive fine manipulation

10  with the dominant right hand.  AR 550.  The VE testified that such an individual could not

11  perform Plaintiff's past relevant work.  AR 550-551.  There were no other jobs for such an

12  individual in the national economy.  AR 551.

13      For the next hypothetical, the ALJ asked the VE to assume an individual with a residual

14  functional capacity for medium work with no repetitive fine manipulation with the right

15  dominant hand.  AR 551.  The VE testified there would be no past relevant work and no other

16  work as would normally be found in the national economy.  AR 550.

17      For the next hypothetical, the ALJ asked the VE to assume a person with a residual

18  functional capacity for sedentary work.  AR 550.  The VE testified he would have the same

19  response.  AR 551.  An individual with frequent change of position and no repetitive fine

20  manipulation with the right dominant hand also would have the same response.  AR 551.

21  <u>Medical Evidence</u>

22      Plaintiff was admitted to Los Angeles County-USC Medical Center on November 17,

23  1978, following a motorcycle accident.  AR 238.  Plaintiff lost consciousness, sustained multiple

24  abrasions and complained of right thigh pain.  AR 238.  A neurosurgery consult indicated that

25  Plaintiff "was essentially without any neurological sequella."  AR 238.  Plaintiff had a right distal

26  third femur fracture, right 5th metacarpal fracture and concussion.  AR 170, 238.  He received a

27  tibial pin and was placed in balanced suspension for six weeks.  AR 238.  During his hospital

28  stay, ortho PA progress notes from January 8, 1979, indicated that Plaintiff appeared to be "high"

1    after spending time on the outside patio with a female friend.  AR 174.   Plaintiff was discharged

2    from the hospital on January 9, 1979.  AR 173, 238.  He was given three months disability.  AR

3    238.

4          Between January 22, 1979, and November 19, 1979, Plaintiff received follow-up

5    treatment at Los Angeles County-USC Medical Center Ortho Trauma Clinic for his right femur.

6    AR 164-169, 171, 172,   In January 1979, the provider indicated that Plaintiff was doing well and

7    noted disability for 3 months.  AR 172.  In November 19, 1979, the provider opined that Plaintiff

8    was "[d]oing well" and should continue range of motion work.  AR 164.

9          In May 1982, Plaintiff sought treatment at USC Medical Center due to an alleged assault.

10   AR 161.  Plaintiff reported being struck in the right jaw.  AR 161.  He was diagnosed with a

11   mandibular fracture.  AR 247.  He was to have his jaw wired.  AR 162.

12         On March 21, 1988, Plaintiff sought emergency treatment for a swollen right hand.  AR

13   251.  Plaintiff reported being beaten with a stick 2 days prior to seeking treatment.  AR 251.

14         Progress notes dated March 14, 2999, from Watts Health Foundation, Inc., Care Programs

15   GREEP, indicated that Plaintiff last worked on July 19, 1999, because of migraines, high blood

16   pressure, allergies, and "neck and back leg arthritis."  AR 255.  Plaintiff had problems with

17   sitting, standing, balance, carrying, lifting and hearing.  AR 255.

18         On June 17, 1999, Sarah L. Maze, M.D., a Diplomate of the National Board of Medical

19   Examiners, completed a consultative neurological evaluation of Plaintiff.  AR 260-264.  Plaintiff

20   chiefly complained of a head injury.  AR 260.  He also reported problems with pain in the back

21   of the neck and intermittent back pain.  AR 260.  He denied difficulty with memory and

22   coordination, but reported being tired all of the time and sad.  AR 260.  He was not taking any

23   medications, but admitted taking a friend's Valium and Darvon for pain.  AR 260-261.  Plaintiff

24   indicated that he recently was released from prison.  AR 261.  He was separated from his wife

25   and had two children ages 14 and 7 years.  AR 261.

26         On mental status examination, Plaintiff was alert with a good general fund of knowledge.

27   AR 261.  Dr. Maze opined that Plaintiff's intellectual functioning appeared to be in the normal to

28   dull normal range.  AR 261.  He comprehended and followed one, two and three part

instructions.  AR 261.  His immediate recall, remote and recent memory were not reduced.  AR 261.  His speech was coherent and logical, and his concentration was not impaired.  AR 261.

On physical examination, Plaintiff walked without a limp.  AR 262.  He was able to stand and walk on heels and toes.  AR 262.  His strength and coordination testing were normal and his reflexes were symmetrical.  AR 263.

Dr. Maze opined that Plaintiff presented with a normal neurological examination.  AR 263.  He remained able to lift 50 pounds occasionally and 25-30 pounds frequently.  AR 263.  He could stand, sit and walk for six hours out of an 8-hour day.  AR 263.  Dr. Maze further opined that Plaintiff may "function better in an environment with minimal contact with others."  AR 263.  Her report was based on formal physical examination, formal testing, and observation of Plaintiff's spontaneous actions.  AR 263.

On June 18, 1999, Albert Shnaider, M.D., a Diplomate of the American Board of Psychiatry and Neurology, conducted a complete consultative psychiatric evaluation of Plaintiff.  AR 265-270.  Dr. Shnaider observed Plaintiff to be limping slightly on his right leg.  AR 265.  Plaintiff complained of lower back pain, neck pain, chronic right leg pain and daily headaches.  AR 265.  Plaintiff reported feeling depressed, hopeless and moderately worthless.  AR 266.  He also  indicated difficulty with memory and concentration.  AR 266.

Plaintiff admitted drinking at least four 40-ounce bottles of beer per day.  AR 266.  He reported using PCP, LSD and heroin on a regular basis until 1989.  AR 266.  He indicated being arrested in 1996 for marihuana possession.  AR 266.  He informed Dr. Shnaider that he borrows Valium from friends 2 to 3 times per month for his headaches.  AR 266.

Dr. Shnaider reported Plaintiff's current level of functioning to include self-dressing, self-bathing and personal hygiene.  AR 267.  Plaintiff performed household chores, errands and shopping.  AR 267.  He reported that his hobby is collecting cans.  AR 267.  His sister pays bills and handles money.  AR 267.  He does not get along with family members and does not like people.  AR 267.  His general daily activities to consisted of watching TV, light reading, playing chess or checkers and visiting with relatives.  AR 267.

On mental status examination, Plaintiff's mood was described a depressed.  AR 268.  He had no paranoid ideations, delusions or hallucinations.  AR 268.  His mini mental status examination score was 30 out of 30.  AR 269.

Dr. Shnaider diagnosed Plaintiff with depression secondary to poly substance abuse, alcohol abuse and poly substance drug abuse.  AR 269.  He assigned Plaintiff a 65 on the Global Assessment of Functioning ('GAF') scale.  AR 269.  Dr. Shnaider opined that Plaintiff presented with a life long history of depression, but "the true etiology of his depression [was] entirely obscured by his history of ongoing drug and alcohol abuse."  AR 269.  He further opined that the drug and alcohol abuse was "most likely responsible" for Plaintiff's depressive symptoms.  AR 269.  Dr. Shnaider also suspected ongoing, undisclosed drug abuse.  AR 269.

Dr. Shnaider indicated that Plaintiff had no difficulty interacting with Dr. Shnaider or clinic staff.  AR 269.  He demonstrated no significant memory or concentration deficits.  AR 269.  Based on the objective symptoms presented, Dr. Shnaider opined that Plaintiff should be able to interact with customers, co-workers and supervisors.  AR 269.  He should be able to adapt to the stresses common to a normal work environment and adequately follow at least moderately complex written and oral instructions.  AR 269.

Dr. Shnaider further indicated that he was unable to diagnose Plaintiff with antisocial personality disorder, despite a significant criminal history, because much of his criminality was "likely to be related to ongoing drug and alcohol abuse, rather than psychopathy."  AR 270.  Dr. Shnaider indicated that Plaintiff's prognosis was guarded due to ongoing drug and alcohol abuse.  AR 270.

On June 23, 1999, H. Harlan Bleecker, M.D., F.A.C.S., a Diplomate of the American Board of Orthopaedic Surgeons, conducted a complete consultative orthopaedic evaluation of Plaintiff.  AR 271-274.  Plaintiff complained of pain in his neck, a throbbing sensation in his left shoulder with certain movement, constant burning sensation in his low back and swelling of the right ankle.  AR 271.  He reported smoking half a pack of cigarettes a day and drinking three or four 32-ounce bottles of beer a day.  AR 272.

On physical examination, Plaintiff's gait was normal and he walked on tiptoes and heels satisfactorily.  AR 272.  He had full range of motion of the neck.  AR 272.  Range of motion in his back, shoulders, elbows, wrists and hips was within normal limits.  AR 272.  His range of motion of the fingers also was within normal limits, except for his right ring finger.  AR 272. Range of motion of the left knee was within normal limits, and his right knee extended to 0 and flexed to 90 degrees.  AR 273.  He had 0 dorsiflexion of the right ankle and 3/8-inch shortening of the right lower extremity.  AR 273.  His lower extremity strength was 5/5 and symmetrical. AR 273.

Dr. Bleecker diagnosed plaintiff with (1) fracture, right femur, healed; and (2) fracture, right fifth metacarpal, healed.  AR 274.  Dr. Bleecker opined that Plaintiff demonstrated only 3/8-inch shortening of his right lower extremity and 90-degree flexion deformity of the right ring finger.  AR 274.  Dr. Bleecker further opined that "it is felt that there are no orthopaedic impairments."  AR 274.

On June 25, 1999, Brian S. Taylor, M.D., a state agency psychiatric consultant, completed a Psychiatric Review Technique form.  AR 275-276.  Dr. Taylor opined that Plaintiff's impairment(s) were not severe.  AR 276.

On July 15, 1999, a state agency medical consultant completed a Physical Residual Functional Capacity Assessment form.  AR 278-285.  The state agency physician opined that Plaintiff could lift and/or carry 50 pounds occasionally, 25 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation (other than as shown for lift and/or carry).  AR 279.  He frequently could climb a ramp/stairs/ladder, balance, stoop, kneel, crouch and crawl.  AR 280. He occasionally could climb a rope or scaffolds.  AR 280.  He had unlimited reaching, handling and feeling.   AR 281.  He had limited fingering and the state agency physician noted no constant repetition on his right hand.  AR 281.  He had no visual, communicative or environmental limitations.  AR 281-282.

On January 21, 2000, Plaintiff tested positive for Hepatitis C.  AR 286.

1    On January 28, 2000, a GR Assessment form noted that Plaintiff's right leg was shorter.

2   AR 252.  Progress notes from Watts Health Foundation, Inc., Care Programs GREEP, indicated

3   that Plaintiff had problems with sitting, standing, turning, balance, bending, writing, pushing,

4   pulling, reaching, carrying and lifting.  AR 253.

5    On March 8, 2000, a state agency physician completed a Physical Residual Functional

6   Capacity Assessment form.  AR 293-300.  The physician opined that Plaintiff could lift and/or

7   carry 50 pounds occasionally, 25 pounds frequently, could stand and/or walk about 6 hours in an

8   8-hour workday, could sit about 6 hours in an 8-hour workday and push and/or pull without

9   limitation (other than as shown for lift and/or carry).  AR 294.  Plaintiff had no postural,

10  manipulative, visual, communicative or environmental limitations.  AR 295-297.

11   On April 10, 2000, Alan R. Schrift, M.D., a state agency psychiatrist, completed a

12  Psychiatric Review Technique form.  AR 277.  Dr. Schrift opined that Plaintiff's impairments

13  were not severe.  AR 277.  He also affirmed the assessment of June 25, 1999.  AR 277.

14   On July 6, 2000, a Ph.D. at Pacific Clinics of the Los Angeles County-Department of

15  Mental Health completed an adult initial assessment of Plaintiff for mental health treatment.  AR

16  306-310.  Plaintiff reported depressed mood, tearfulness, social withdrawal, memory problems,

17  poor concentration, insomnia, impulse control difficulties, fatigue and apparent visual

18  hallucinations (space ships).  AR 306.  He described his past drug use to include PCP, alcohol,

19  marijuana, acid and mushrooms.  AR 307.  He indicated that his current use included marijuana

20  and alcohol.  AR 307.

21   On mental status evaluation, Plaintiff was dysphoric, tearful, irritable and hopeless.  AR

22  309.  His intellectual functioning was impaired and was estimated to be in the slightly below

23  average range.  AR 309.  Plaintiff was diagnosed with a mood disorder not otherwise specified,

24  rule out social phobia, polysubstance dependence (sustained full remission), alcohol dependence

25  (sustained partial remission), cannabis dependence (sustained partial remission) and antisocial

26  personality disorder.  AR 310.

27   On August 22, 2000, Plaintiff underwent a psychiatric evaluation at Pacific Clinics.  AR

28  316-317.  He reported his belief that he was being followed and studied by the government, that

he gets subliminal messages from the TV to control his mind, that Cal Tech has devices to control the weather, that he saw a space ship and that he sees ghosts.  AR 316.  The evaluator diagnosed paranoid schizophrenia, R/O social anxiety, antisocial personality disorder and hypertension.  AR 315.  He was prescribed a trial of Zyprexa.  AR 315.

On September 5, 2000, Plaintiff sought follow-up treatment at Pacific Clinics.  AR 314. Plaintiff reported that he still believed the government was after him, that he was being student and that he was getting messages from TV.  AR 314.  The provider increased Plaintiff's Zyprexa. AR 314.

On September 20, 2000, Plaintiff sought treatment at Pacific Clinics.  AR 314.  He reported that he was still feeling that he is being studied by the government and that he has the power to read minds.  AR 314.  The provider increased Plaintiff's Zyprexa.  AR 314.

Between October 17, 2000, and February 7, 2001, Plaintiff received follow-up treatment at Pacific Clinics on six occasions.  AR 311-312.  Plaintiff continued on Zyprexa, which he reported working "good" on December 14, 2000.  AR 312.

On March 7, 2001, Plaintiff saw Dr. El-Gabalawy at Pacific Clinics for mental health medication support due to paranoid schizophrenia.  AR 348.  Dr. El-Gabalawy reported that Plaintiff continued to do well.  AR 348.  Plaintiff denied hallucinations or paranoia.  AR 348.  He was to continue Zyprexa.  AR 348.

On April 11, 2001, Plaintiff sought treatment from Dr. El-Gabalawy.  AR 347.  Plaintiff reported doing well and that he was staying with his sister.  AR 347.  He was to continue taking Zyprexa.  AR 347.

On May 9, 2001, Dr. El-Gabalawy prepared a letter regarding treatment of Plaintiff.  AR 343.  Dr. El-Gabalawy reported that Plaintiff had been under psychiatric care at Pacific Clinics since August 2000.  AR 343.  He was on antipsychotic medications for paranoid schizophrenia. AR 343.  Dr. El-Gabalawy also indicated that Plaintiff had a history of polydrug dependence in remission, along with a medical history of head injury, hypertension and Hepatitis C.  AR 343. Dr. El-Gabalawy opined that Plaintiff had been compliant with medication and appointments, as well as being sober and drug free.  AR 343.

1    Plaintiff also saw Dr. El-Gabalawy for treatment on May 9, 2001.  AR 346.  Dr. El-

2    Gabalawy opined that Plaintiff continued to do well with no paranoia or hallucinations.  AR 346.

3    Plaintiff was compliant with his medications and was to continue Zyprexa.  AR 346.

4    On June 13, 2001, Plaintiff saw Dr. El-Gabalawy for medication support.  AR 345.  Dr.

5    El-Gabalawy opined that Plaintiff was doing well.  AR 345.  Plaintiff reported working "under

6    the table for his uncle (gardening)."  AR 345.  Plaintiff was to continue with Zyprexa.  AR 345.

7    On August 15, 2001, Plaintiff saw Dr. El-Gabalawy for treatment.  AR 344.  Dr. El-

8    Gabalawy opined that Plaintiff continued to do well.  AR 344.  Plaintiff reported that he avoided

9    people and stayed to himself "in order not to get in trouble."  AR 344.  Dr. El-Gabalawy

10   indicated that Plaintiff was compliant with his medications and was to continue with Zyprexa.

11   AR 344.

12   On October 3, 2001, Stuart Shipko, M.D., a Diplomate of the American Board of

13   Psychiatry and Neurology, completed a consultative comprehensive psychiatric examination of

14   Plaintiff.  AR 349.  Dr. Shipko opined that Plaintiff was "a vague and evasive historian."  AR

15   349.  Plaintiff stated that he has "heard voices" since he was a teen.  AR 349.  Dr. Shipko opined

16   that Plaintiff did not perceive the voices as external and knew that they were his own thoughts.

17   AR 349.  The voices/thoughts most often focused on danger to or hurting himself or others.  AR

18   349.  Plaintiff also reported that he had not used any drugs for years.  AR 350.  He denied current

19   medical problems.  AR 350.

20   On mental status examination, Plaintiff was alert and oriented to time, place, person and

21   reason for the interview.  AR 350.  His gait and motor activity were normal.  AR 350.  His mood

22   was neutral and his affect was appropriate to the content of speech.  AR 350.  Dr. Shipko opined

23   that Plaintiff had no delusions of persecution, grandeur or reference.  AR 350.  Dr. Shipko did

24   not observe any suicidal, homicidal or paranoid ideation or hallucinations.  AR 350.  Plaintiff's

25   cognition was appropriate to his level of education.  AR 350.  His abstract reasoning was intact

26   and his insight and judgment were good.  AR 351.

27   Dr. Shipko diagnosed Plaintiff with polysubstance abuse, sociopathic personality disorder

28   and malingering.  AR 351.  Dr. Shipko reported that although Plaintiff hears voices, Plaintiff is

1  "quite clear that these are internal thoughts and he does not give the history of a hallucination.

2  AR 351.  Dr. Shipko opined that the history seemed "to be fabricated since his last social security

3  evaluation."  AR 351.  Plaintiff had no objective findings of schizophrenia such as

4  suspiciousness, preoccupation with internal stimuli, blunting of affect or loosening of

5  associations.  AR 351.  Dr. Shipko further opined that Plaintiff was careful to conceal

6  information regarding his criminal history and his drug history.  AR 351.  Dr. Shipko did not feel

7  that Plaintiff's records or his examination supported a diagnosis of mental illnesses other than his

8  history of drug abuse and his sociopathic personality traits.  AR 351.  Dr. Shipko indicated that

9  Plaintiff was not competent to manage funds on his own behalf.  AR 352.  Dr. Shipko opined that

10  a meaningful functional assessment could not be made due to malingering.  AR 352.

11        On October 11, 2001, Dr. Shipko also completed a Medical Source Statement of Ability

12  to Do Work-Related Activities (Mental) form.  AR 353-354.  Dr. Shipko opined that Plaintiff's

13  ability to understand, remember and carry out instructions and his ability to respond appropriately

14  to supervision, co-workers, and work pressure in a work setting were not affected by his

15  impairment.  AR 353-354.

16        On October 15, 2001, Plaintiff saw Dr. El-Gabalawy for medication support.  AR 356.

17  Dr. El-Gabalawy indicated that Plaintiff continued to do well and was still looking for a job.  AR

18  356.  Plaintiff denied using drugs.  AR 356.  Plaintiff was to continue with Zyprexa.  AR 356.

19        On December 10, 2001, Plaintiff received medication support from Dr. El-Gabalawy.

20  AR 355.  Dr. El-Gabalawy opined that Plaintiff was responding well and staying out of trouble.

21  AR 355.  Plaintiff admitted to occasionally drinking beer and smoking THC.  AR 355.  Dr. El-

22  Gabalawy educated Plaintiff about the risks of alcohol and THC and indicated that Plaintiff

23  needed to stop completely.  AR 355.  Plaintiff was to continue Zyprexa.  AR 355.

24        On February 5, 2004, Plaintiff was seen in the California Department of Corrections Hep

25  C Clinic.  AR 504.  Plaintiff did not want a prescription.  AR 504.

26        On November 10, 2004, Plaintiff saw Mike Witwer, MD, FACP, a physician and surgeon

27  at Sierra Conservation Center.  AR 501.  Plaintiff indicated that he wanted prophylactic TB

28

1   treatment.  AR 501.  Chest x-rays were normal.  AR 511.  He had no active disease and no

2   evidence of active tuberculosis.  AR 512.

3          On December 2, 2004, Plaintiff received counseling in prison regarding TB infection and

4   disease.  AR 500.

5          ALJ's Findings

6          The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the

7   alleged onset of disability.  AR 366.  The ALJ found that Plaintiff had the severe impairments of

8   Hepatitis C, history of polysubstance abuse, sociopathic personality disorder, and healed right

9   femur fracture and healed right 5th metacarpal.  AR 366.  The ALJ concluded that Plaintiff did

10  not have an impairment or combination of impairments that met or medically equaled one of the

11  listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 366.  The ALJ further

12  found that Plaintiff had the residual functional capacity to lift and carry 50 pounds occasionally

13  and 25 pounds frequently.  AR 366.  He could sit, stand, and walk about 6 hours in an 8-hour

14  day.  AR 366.  He also could perform simple repetitive tasks.  AR 366.  Therefore, the ALJ

15  concluded that Plaintiff's impairments did not prevent him from performing his past relevant

16  work as a telephone operator, a customer service representative and a driver.  AR 366.  The ALJ

17  also used Rule 203.25 of the Medical-Vocational Guidelines as a framework to determine that

18  Plaintiff was not disabled based on his residual functional capacity for medium work, his age as a

19  younger individual and his limited education.  AR 366.  Therefore, the ALJ concluded that

20  Plaintiff was not under a "disability."  AR 366.

21                              **SCOPE OF REVIEW**

22         Congress has provided a limited scope of judicial review of the Commissioner's decision

23  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

24  the Court must determine whether the decision of the Commissioner is supported by substantial

25  evidence.  42 U.S.C. § 405(g).  Substantial evidence means more than a mere scintilla,

26  *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v.*

27  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

28  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

                                           16

1   (internal quotation marks and citation omitted).  The record as a whole must be considered,

2   weighing both the evidence that supports and the evidence that detracts from the Commissioner's

3   conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and

4   making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v.*

5   *Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's

6   determination that the claimant is not disabled if the Commissioner applied the correct legal

7   standards, and if the Commissioner's findings are supported by substantial evidence.  *See*

8   *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

9                                                                **REVIEW**

10       In order to qualify for benefits, a claimant must establish that he is unable to engage in

11   substantial gainful activity due to a medically determinable physical or mental impairment which

12   has lasted or can be expected to last for a continuous period of not less than 12 months.  42

13   U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

14   such severity that he is not only unable to do his previous work, but cannot, considering his age,

15   education, and work experience, engage in any other kind of substantial gainful work which

16   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

17   The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

18   Cir. 1990).

19       In an effort to achieve uniformity of decisions, the Commissioner has promulgated

20   regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

21   C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g) (2006).  Applying the evaluation process in this case,

22   the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged

23   onset of disability; (2) has an impairment or a combination of impairments that is considered

24   "severe" (Hepatitis C, history of polysubstance abuse, sociopathic personality disorder, healed

25   right femur fracture and healed right 5th metacarpal) based on the requirements in the Regulations

26   (20 C.F.R. § 416.920(c) (2006)); (3) does not have an impairment or combination of impairments

27   that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; and

28

1  (4) is able to perform his past relevant work as a telephone operator, a customer service

2  representative and a driver.  AR 366.

3       In this case, Plaintiff argues that the ALJ erred by: (1) rejecting the prior residual

4  functional capacity assessment on remand; and (2) rejecting the presence of a severe mental

5  impairment.

6                      **DISCUSSION**

7  A.     Residual Functional Capacity Following Remand

8       1.    Rule of Mandate

9       Plaintiff argues that the ALJ erred by rejecting the prior residual functional capacity

10  assessment and changing the finding of the manipulative impairment on remand. Plaintiff's

11  Opening Brief, at p. 8.  To support his argument, Plaintiff alleges that the ALJ's change did not

12  fall within the scope of the stipulated remand and violated the mandate of the case, which directs

13  consideration of the manipulative limitations framed in the first ALJ decision.  Plaintiff further

14  contends that the letter and spirit of the stipulation, order and judgment demand that Plaintiff

15  "has a manipulative impairment against repetitive fine fingering."  Plaintiff's Opening Brief, at p.

16  9.  Plaintiff's argument and contentions are without merit.

17       Here, the parties stipulated to a remand by the district court in December 2002.  AR 399-

18  401.  The stipulation signed by counsel for the parties provides, in relevant part, as follows:

19          that this action be remanded to the Commissioner of Social Security for further
        administrative proceedings, including a new hearing and decision.  Upon remand

20          the Administrative Law Judge ("ALJ") will ... 3) **re-assess plaintiff's residual
        functional capacity, both physical and mental**, in light of all record medical

21          evidence....

22  AR 399-400, 401 (emphasis added).  The plain language of the stipulation identifies the parties'

23  agreement to the reassessment of Plaintiff's physical residual functional capacity.  There is no

24  indication that the ALJ was prohibited from re-evaluating Plaintiff's physical limitations

25  (including manipulative limitations) on remand.  Plaintiff's contention that he stipulated to a

26  remand only "for reconsideration of the mental impairments afflicting him" is contradicted by the

27  express language of the stipulation.

28

1    Further, Plaintiff's citations to "rule of mandate" cases for the proposition that the ALJ

2    could not revisit its already final determinations are not instructive.  The parties expressly

3    stipulated to reassessment of Plaintiff's residual functional capacity on remand and the district

4    court ordered remand of the matter "pursuant to the Stipulation for Remand and Order of

5    Remand" filed by the parties.  AR 397-397.

6          2.     Inquisitorial Nature of Proceedings

7    Plaintiff next argues that the ALJ's finding violates the inquisitorial nature of the

8    proceedings.  Plaintiff's Opening Brief, at p. 9.  Plaintiff contends that the ALJ erred by failing

9    "to raise the intent to change/eliminate the limitation with respect to the ability to engage in fine

10   manipulation at or before the conclusion of the hearing."  Plaintiff's Opening Brief, at p. 9-10.

11   Plaintiff cites case law regarding the inquisitorial nature of social security hearings before an

12   ALJ.  *See*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080 (2000).

13   Although Plaintiff correctly contends that social security hearings are not adversarial

14   proceedings, Plaintiff himself bears the burden of proving that he is disabled.  *Meanel v. Apfel*,

15   *172 F.3d 1111, 1113-1114 (9th Cir. 1999)* (claimants represented by counsel must raise all issues

16   and evidence at their administrative hearings).  When the evidence is ambiguous or "the record is

17   inadequate" to allow for proper evaluation of the evidence, however, the ALJ has a duty to

18   develop the record.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001).  Here, there is no

19   indication that the evidence was ambiguous or the record inadequate to allow for proper

20   evaluation of any manipulative limitations.  The ALJ determined that Dr. Bleecker, who

21   conducted a consultative orthopaedic evaluation of Plaintiff, "did not identify any limitations that

22   would cause any limitations."  AR 365.  The record demonstrates that Plaintiff did not complain

23   to Dr. Bleecker about his right hand.  AR 271-274.  Dr. Bleecker noted that Plaintiff's range of

24   motion was not within normal limits in the right ring finger and that Plaintiff had a 90-degree

25   flexion deformity of the right ring finger.  AR 272, 274.  Dr. Bleecker concluded, however, that

26   Plaintiff had a healed fracture of the right fifth metacarpal and that Plaintiff had "no orthopaedic

27   impairments."  AR 274.

28

1          3.      Opinion of State Agency Physician

2          Plaintiff contends that the ALJ erred by failing to articulate the weight given to state

3   agency and medical expert opinions.  While the ALJ did not expressly state the weight afforded

4   to the opinions of state agency and medical expert opinions, the ALJ accepted the opinion of the

5   examining physician, Dr. Bleecker, who did not identify any orthopaedic limitations.  AR 365.

6   Failure by the ALJ to articulate or explain the weight given to the reports of the examining or

7   consultative physicians can be harmless error.  *See* *Curry v. Sullivan*, 925 F.2d 1127, 1129 (9th

8   Cir.1991).

9          To support his argument for a manipulative limitation, Plaintiff relies on the opinion of a

10  non-examining state agency physician, who opined in July 1999 that Plaintiff had a limitation in

11  the right hand for repetitive fingering.  AR 361.  Plaintiff's reliance is misplaced.  The opinion of

12  a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the

13  rejection of the opinion of either an examining physician or a treating physician. *Pitzer v.*

14  *Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir. 1990).  Here, the examining physician did not find any

15  manipulative limitations.  Further, a state agency physician issued a contradictory opinion in

16  March 2000 that Plaintiff had no manipulative or other limitations.  AR 295-297.

17  B.     Severe Mental Impairment

18         Plaintiff contends that ALJ erred in rejecting the presence of a severe mental impairment

19  and that Plaintiff's mental impairment is inconsistent with work activity at any level of exertion.

20  Opening Brief, at p. 12.  To support his argument, Plaintiff does not cite any evidence of

21  functional limitations imposed by Plaintiff's treating or examining physicians, but identifies the

22  diagnoses of Drs. El-Gabalawy and Shipko.  The mere diagnosis of a mental impairment is not

23  sufficient to sustain a finding of disability.  *See*, *e.g*., *Key v. Heckler*, 754 F.2d 1545, 1549 (9th

24  Cir. 1985).

25         Further, the determination of an impairment's severity is distinct from the determination

26  of residual functional capacity.  At the second step of the sequential evaluation of disability, the

27  ALJ determines whether a claimant has a severe impairment or combination of impairments.  A

28  severe impairment is one that significantly limits the claimant's physical or mental ability to do

1 | basic work activities. 20 C.F.R. § 416.920(c). An impairment or combination of impairments is

2 | found "not severe" and a finding of "not disabled" is made at this step "when medical evidence

3 | establishes only a slight abnormality or a combination of slight abnormalities which would have

4 | no more than a minimal effect on an individual's ability to work even if the individual's age,

5 | education, or work experience were specifically considered (i.e., the person's impairment(s) has

6 | no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work

7 | activities)." Social Security Ruling ("SSR") 85-28.

8 |      In contrast, at step four, further evaluation of the claimant's inability to work is made

9 | based on an analysis of the claimant's residual functional capacity and an assessment of other

10 | vocational factors. 20 C.F.R. § 416.920(a). Accordingly, at the fourth step of the sequential

11 | evaluation process, a claimant's capacity to perform relevant work performed in the past is

12 | evaluated on the basis of a medical assessment of the claimant's residual functional capacity and

13 | a vocational assessment of the physical and mental demands of the work. 20 C.F.R. §

14 | 416.920(e). A claimant who has the capacity to perform past relevant work will be found not

15 | disabled. *Id.*

16 |      Here, at step two, the ALJ determined that plaintiff suffered from a "severe" medically

17 | determinable mental impairment or combination of impairments which were more than slight

18 | abnormalities and had more than a minimal effect on his ability to work. The ALJ described

19 | these mental impairments as "history of polysubstance abuse, sociopathic personality disorder."

20 | AR 366. He then went on to step three and determined that Plaintiff's impairments did not meet

21 | or equal a listing.

22 |      At step four of the sequential evaluation, the ALJ stated, "A determination must be made

23 | whether the claimant retains the residual functional capacity to perform the requirements of his

24 | past relevant work or other work existing in significant numbers in the national economy." AR

25 | 363. The ALJ then reviewed and discussed the medical record, Plaintiff's testimony, third party

26 | questionnaires and medical opinions, and concluded that Plaintiff retained the residual functional

27 | capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, to sit, stand, and walk

28 | about 6 hours in an 8-hour day and to perform simple repetitive tasks. AR 365. The ALJ

1   determined that Plaintiff retained the exertional capacity for medium work and was therefore

2   capable of performing his past relevant light unskilled work.  AR 365.

3          The ALJ's finding at step two that Plaintiff suffered from a "severe" impairment, did not

4   preclude his finding at step four that Plaintiff could perform work at the medium exertion level.

5   As noted, the analysis at each step is separate and distinct and one finding does not dictate any

6   particular outcome.  A person found to have a severe impairment at step two may still be found at

7   step four to be capable of medium work.  A "severe" impairment at step two is merely an

8   impairment or combination of impairments that has more than a minimal effect on the claimant's

9   abilities to perform basic work activities.  *See* 85-28.  The step two analysis is a threshold one

10  which enables the ALJ to deny benefits based on medical considerations alone to those

11  applicants with impairments of such minimal nature that they could never prevent a person from

12  working.  *Id.*  The ALJ's findings that plaintiff's history of polysubstance abuse and sociopathic

13  personality disorder passed this minimal threshold did not dictate any particular outcome, but

14  rather allowed the ALJ to go further with the sequential evaluation where he could consider both

15  medical and vocational evidence.

16                                    **CONCLUSION**

17         Based on the foregoing, the Court finds that the ALJ's decision is supported by

18  substantial evidence in the record as a whole and is based on proper legal standards.

19  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

20  Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in

21  favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff

22  Mark Gallegos.

23

24  _____ IT IS SO ORDERED. _____

25  **Dated:   April 10, 2008**              **/s/ Gary S. Austin**
    _____
                                            UNITED STATES MAGISTRATE JUDGE
26

27

28

                                          22